E-FILED
Wednesday, 20 May, 2020  05:02:54 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | |
| ) | |
| Plaintiff,  ) | |
| ) | |
| vs.  ) | Case No. 14-CR-20035 |
| ) | |
| DAVID LEE GARCIA JR.,  ) | |
| ) | |
| Defendant.  ) | |

## THE UNITED STATES OF AMERICA'S RESPONSE TO THE
## DEFENDANT'S MOTION FOR SENTENCE REDUCTION

NOW COMES the United States of America, by John C. Milhiser, United States Attorney for the Central District of Illinois, and Eugene L. Miller, Assistant United States Attorney, and hereby requests that this Court deny the defendant's motion to reduce his sentence because (1) neither the fear of contracting a disease nor alleged, but unverified, asthma are "extraordinary and compelling reasons" warranting a reduction in sentence under Title 18, United States Code, Section 3582(c)(1)(A)(i) as defined by Section 1B1.13 of the United States Sentencing Guidelines; and (3) the defendant's release would present a danger to the community under Title 18, United States Code, Section 3142(g), the Section 3553(a) factors do not warrant a sentence reduction, and the federal Bureau of Prisons has addressed and will continue to address the defendant's concerns.

## FACTUAL BACKGROUND

**I.      The Defendant's Background.**

The defendant, David Lee Garcia Jr., is currently serving a sentence of 194 months in the federal Bureau of Prisons for his participation in a large-scale drug trafficking conspiracy. According to the BOP website, Garcia's projected release date is July 15, 2028.

From at least 2012 through June 19, 2014, a drug conspiracy involving Garcia, Valeriano ("Billy") Zarate, Eulalio Martinez, and others arranged for large quantities of cocaine (typically, 50 kilograms) to be driven in semi-tractor trailers from the Gulf Cartel in the Mission, Texas area to locations in Vermilion County, Illinois, Indianapolis, Indiana, and elsewhere. Garcia owned a trucking company in Texas and its semi-tractors were used to transport approximately 50 kilograms of cocaine at a time to Billy Zarate and Eulalio Martinez for approximately two years. Garcia later recruited one of his trucking employees, Oscar Martinez, to drive along with Garcia in a semi-tractor trailer transporting 50 kilograms of cocaine from Texas to Oakwood, Illinois on three occasions, and on each occasion, they returned to Texas with approximately $1 million.

In June of 2014, DEA agents seized 49 kilograms of cocaine from a tractor-trailer Garcia and Oscar Martinez were driving from Mission, Texas to Oakwood, Illinois to deliver to Zarate and Eulalio Martinez. A federal grand jury indicted Garcia, Oscar

Martinez,[1] Eulalio Martinez, and later, Billy Zarate, with conspiracy to possess more than five kilograms of cocaine with the intent to distribute it.

Based on the amount of cocaine attributable to Garcia (approximately 5,349 kilograms of cocaine he transported) and his two prior felony drug convictions, he potentially faced a mandatory life sentence. Attorney General Eric Holder's "Smart on Crime" guidelines, however, resulted in the filing of only one of Garcia's prior convictions under Section 851. Prior to sentencing, Garcia asked to be released from custody on conditions of bond. (R.81) The Court denied Garcia's motion to be released on bond. (D.E. 10/26/15) On November 9, 2015, the Court sentenced Garcia to serve 194 months of imprisonment in the federal Bureau of Prisons. (R.90) According to the BOP website, the BOP has assigned the defendant to serve his sentence at the United States Penitentiary in Atlanta, Georgia.

According to the defendant's filing, on April 5, 2020, the defendant asked the warden at Atlanta USP to support his request that his sentence be reduced to time served due to the COVID-19 national pandemic. On April 24, 2020, the defendant filed a motion with this Court requesting a sentence reduction pursuant to 18 U.S.C.

---

[1] The Federal Public Defender's Office represented co-defendant Oscar Martinez in this same case. Oscar Martinez provided testimony and received a sentencing reduction from the Court for his cooperation against his co-defendants. The Amended Motion filed in this case by the FPD does not indicate that Oscar Martinez has given informed consent to the FPD's representation of his co-defendant. *See, e.g., United States v. Basham,* 918 F. Supp. 2d 787, 796 (C.D. Ill. 2013) (finding that counsel's prior representation of co-defendant resulted in an actual conflict of interest); *see also* Ill. Rules of Prof. Conduct R. 1.9(a) ("A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.").

§ 3582(c)(1)(A)(i). (R.95) On May 13, 2020, the Federal Public Defender filed an amended motion requesting a sentence reduction. (R.97) The Court ordered the United States to respond by May 20, 2020. (D/E 5/4/2020)

## II.    The Bureau Of Prison's Response To The COVID-19 Pandemic.

As this Court is well aware, COVID-19 is an illness that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease

4

Control, including by reviewing guidance from the World Health Organization. On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

### A.      The Attorney General's March 26, 2020 Memorandum

On March 26, 2020, the Attorney General issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020 Memorandum) to ensure that, in light of the COVID-19 pandemic, BOP uses home confinement, where appropriate, to protect the health and safety of BOP personnel and people in BOP's custody.  Pursuant to the March 26, 2020 Memorandum, BOP is prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic.

BOP's statutory authority to transfer prisoners to home confinement rests in 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. BOP's policy and procedures regarding home confinement are outlined in BOP Program Statement 7320.01, Home Confinement and BOP Operations Memorandum, *Home Confinement under the First Step Act*, both of which are available on www.bop.gov via the Resources tab. Both statutes set forth certain limitations with respect to the BOP's transfer authority. *See* 18 U.S.C. § 3624(c)(2) and 34 U.S.C. § 60541. Pursuant to the Attorney General's directives, however, in light of the COVID-19 pandemic, BOP began immediately reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention

(CDC), to determine which inmates are suitable for home confinement. Since the release of the Attorney General's original Memorandum dated March 26, 2020, BOP is prioritizing transfers to home confinement of all suitable inmates as an appropriate response to the COVID-19 pandemic. It was noted in the March 26, 2020, Memorandum, however, that many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care.

In assessing whether home confinement should be granted pursuant to the March 26, 2020, Memorandum, BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

a. The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need), with inmates who have anything above a minimum score not receiving priority treatment;

e. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of contracting COVID-19 than the inmate would face in his or her BOP facility;

f. The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community.  Some offenses, such as sex

offenses, will render an inmate ineligible for home confinement. Other serious offenses weigh heavily against consideration for home confinement.

In addition to setting forth these factors, the March 26, 2020, Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement. The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

Moreover, the March 26, 2020, Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

### B.    The Attorney General's April 3, 2020, Memorandum

The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorizes the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of

emergency conditions that are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the Bureau of Prisons (April 3, 2020, Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determines that COVID-19 is materially affecting operations.

The April 3, 2020, Memorandum specifically stated that BOP should move with dispatch in using home confinement, where appropriate, to move vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the BOP continues to process the remaining inmates who are eligible for home confinement under pre-CARES Act standards.

The April 3, 2020, Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020, Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act.

For inmates deemed suitable candidates for home confinement, the April 3, 2020, Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP

8

facility. The April 3, 2020, Memorandum further authorized BOP to, in appropriate cases, require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate is being transferred rather than in the BOP facility from which the inmate is being transferred. The assessment of all inmates remains guided by the factors in the March 26, 2020, Memorandum.

The April 3, 2020, Memorandum also recognized that the BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

Lastly, the April 3, 2020, Memorandum stated that it is essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

### C.    BOP's Implementation of the March 26, 2020, and the April 3, 2020, Memoranda.

BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country. BOP is assessing the inmate population to determine which inmates would be appropriate for transfer under this priority program. BOP is then processing those inmates for transfer as expeditiously as possible.

BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives. BOP has increased home confinement since March 2020, and is continuing to aggressively screen inmates for home confinement. Since the March 26, 2020, Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, BOP has placed additional inmates on home confinement. *See* www.bop.gov.

Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General. While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

It should be noted that for public safety reasons, in accordance with the March 26, 2020, Memorandum, and to ensure BOP is deploying its limited resources in the most effective manner, BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

10

In addition, and to prioritize its limited resources, BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences. While these priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is at this time prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences.  As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration.

If the incarcerated individual does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies.[2]

---

[2] The Court has no authority to review BOP's decision whether to place the defendant on home confinement. Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). Because home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny the request. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons.").

D.      **Measures to Protect Inmate and Staff Safety.**

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.  These steps include, but are not limited to the following:

a.      BOP has implemented its Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions;

b.      All staff and inmates have been and will continue to be issued an appropriate face covering and strongly encouraged to wear the face covering when in public areas when social distancing cannot be achieved;

c.      Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission and at medical centers, all staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer;

d.      Contractor access to BOP facilities is restricted to only those performing essential services (*e.g.*, medical or mental health care, religious, *etc.*) or those who perform necessary maintenance on essential systems. All volunteer visits are suspended absent authorization by the Deputy Director of BOP. Any contractor or volunteer who requires access will be screened for symptoms and risk factors;

e.   Social and legal visits were stopped as of March 13, 2020, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates. To ensure that familial relationships are maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month. Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols in place for prison staff, contractors, and visitors;

f.   Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

**E.    The United States Penitentiary at Atlanta and This Defendant.**

According to the BOP website, the United States Penitentiary at Atlanta has 1,978 total inmates. As a result of BOP's aggressive measures, to date, only two inmates are currently positive for COVID-19 (approximately 0.1% of the inmate population) and there have been no inmate deaths. Thus far, the defendant has shown no signs of having contracted COVID-19. Because COVID-19 is a relatively new disease, there is limited information regarding risk factors for severe disease. Nonetheless, the CDC has developed guidelines based on currently available information and clinical expertise:

1.   *Age*: The highest risk for severe illness from COVID-19 are individuals 65 years and older and those living in a nursing home or long-term care facility. According to the CDC website, 8 out of 10 deaths from COVID-19 occur in people 65 years and older. Because the defendant is currently 38 years of age, he is not considered high risk based on his age.

2.   *Other vulnerability*: The CDC website lists a variety of underlying medical conditions that, if not well controlled, may result in a higher risk of serious illness from COVID-19. These conditions include diabetes, severe obesity, moderate to severe asthma, chronic kidney disease, liver disease, a serious heart condition, or a compromised immune system from HIV or cancer treatment. The defendant

13

alleges he has asthma, but does not allege that it is moderate to severe or that it is not well controlled.

Thus, the defendant has not alleged, let alone established, that he suffers from underlying medical conditions that could result in a higher risk of serious illness from COVID-19.

## LEGAL FRAMEWORK

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his or her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on his or her behalf. § 3582(c)(1)(A). A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i). As the movant, the defendant bears the burden to establish that he or she is eligible for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

14

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A). The policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, comment. (n.1(A)(i)). Second, the standard is met if the defendant is:

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

USSG § 1B1.13, comment. (n.1(A)(ii)).

The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and

family circumstances, neither of which applies here. USSG § 1B1.13, comment. (n.1(B)-
(C)). Finally, the note recognizes the possibility that BOP could identify other grounds
that amount to "extraordinary and compelling reasons," but the defendant has not
alleged any such grounds. USSG § 1B1.13, comment. (n.1(D)).

## RESPONSE

I.      **Neither The Fear Of Contracting A Disease Nor Asthma Standing Alone Is An
        "Extraordinary And Compelling Reason" Under Title 18, United States Code,
        Section 3582(c)(1)(A)(i) As Defined By Section 1B1.13 Of The United States
        Sentencing Guidelines.**

One of the threshold questions raised by the deluge of motions from inmates
requesting sentence reductions based on COVID-19 is whether Congress intended in
the First Step Act for each of the district courts throughout the country to be required to
micro-manage the appropriate BOP response to the pandemic for each and every one of
BOP's 170,435 inmates (plus 36,697 employees) at over 100 facilities throughout the
United States.[3] The answer must be no. Otherwise, identical inmates at the same
institution would be subject to widely varying interpretations of what reasons are
"extraordinary and compelling" based on the particular court that addressed their
motion for a sentence reduction.[4] Moreover, BOP has numerous tools at its disposal to

---

[3] As noted, a defendant may not file a motion for sentence reduction under Section
3582(c)(1)(A) unless he has first requested that the Director of BOP do so on his behalf, and until
either he has exhausted his administrative remedies or 30 days have passed since his request.
Although the defendant filed his motion prematurely only 19 days after he made his request, 30
days have now passed since the request, and the United States does not further press the
defendant's failure to comply with this statutory exhaustion requirement.

[4] This is not to suggest that either BOP's decisions regarding the manner of confinement
or the defendant's conditions of confinement are not subject to judicial review. *See, e.g.*, 28
U.S.C. § 2241 (habeas statute); 42 U.S.C. § 1983 (civil rights statute). Those actions, however, are

address the pandemic, while district courts are only able to reduce a defendant's sentence; in some cases (such as this one), the Court would be required to drastically reduce a lawfully imposed sentence by a number of years simply to avoid a medical condition that has not yet, and may never, come to fruition for a particular inmate and that may last only a number of days or weeks, if it does come to fruition.

Instead, Congress sought consistency and uniformity by wisely requiring any such sentence reduction to be consistent with applicable policy statements issued by the United States Sentencing Commission, which includes vesting the authority to determine what constitutes "other reasons" in the Director of BOP. Another court in the Central District of Illinois has held that the COVID-19 pandemic is not a sufficient ground to reduce a sentence under Section 3582(c)(1)(A)(i) because it is not consistent with the Sentencing Commission's policy statements. *See United States v. Ramon Garcia,* CDIL Case No. 4:05-cr-40098, Docket 91 (Apr. 28, 2020); *but cf. United States v. Jeremy Seggebruch,* Case No. 15-cr-20034, Docket 113 (May 15, 2020); *United States v. Robert Brooks,* Case No. 07-cr-20047, Docket 67 (May 15, 2020),

Under Section 3582, a court may reduce a term of imprisonment if it finds both that "extraordinary and compelling reasons warrant such a reduction" and "such a reduction is consistent with applicable policy statements issued by the Sentencing

---

properly brought in separate civil actions in the district of confinement, not in the underlying criminal case in the district of prosecution. *See, e.g., Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *10 (N.D. Ohio Apr. 22, 2020) (ordering BOP to evaluate each subclass member's eligibility for transfer out of Elkton through any means by May 6, 2020). The discussion, *infra,* establishes that Congress did not intend to expand Section 3582(c) to encompass actions under Section 2241 or Section 1983.

Commission." 18 U.S.C. § 3582(c)(1)(A). That policy statement, which appears at U.S.S.G. § 1B1.13, was specifically referenced by Congress in the statute and is therefore binding on district courts.

The application notes to § 1B1.13 identify the following as extraordinary and compelling reasons meriting consideration for release: medical condition of the defendant; age of the defendant; and family circumstances. U.S.S.G. § 1B1.13, comment. (n.1(A)-(C)). Application Note 1(D) permits release for "Other Reasons" not specifically listed, but only after the Director of BOP determines that such other extraordinary and compelling reasons do exist. U.S.S.G. § 1B1.13, comment. (n.1(D)). This is not a catch-all provision for any and all reasons proffered by defendants.[5]

The policy statement also incorporates a BOP program statement further defining sufficient circumstances for immediate release. The BOP program lists circumstances involving medical conditions, elderly inmates, death or incapacity of a family member caregiver, and incapacity of a spouse. BOP Program Statement 5050.50. The defendant argues that the changes made by the First Step Act have vested this Court with authority to identify the extraordinary and compelling circumstances that may warrant a sentence reduction. The First Step Act, however, left unchanged a critical statutory command: any reduction must be "consistent with applicable policy statements issued by the Sentencing Commission." Here, the applicable policy

---

[5] The full application note reads as follows:

(D) Other Reasons – As determined by the Director of [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

18

statement provides no basis for a sentence reduction based on a global pandemic, concern an inmate will contract a disease while in custody or age standing alone.

As before, Congress has directed the Sentencing Commission to determine the permissible grounds for release under this provision. That directive is expressed in several statutes. Congress directed the Sentencing Commission to adopt policy statements regarding "the appropriate use of . . . the sentence modification provisions set forth in section[] . . . 3582(c) of title 18." 28 U.S.C. § 994(a)(2)(C). Providing further guidance, Section 994(t) states: "The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." Finally, as stated, § 3582(c)(1)(A) conditions judicial relief on fidelity to the applicable policy statement, which appears at USSG § 1B1.13.

Numerous other courts, including courts within the Seventh Circuit, concur with the view that the policy statement remains controlling. *See, e.g., United States v. Neubert*, 2020 WL 1285624, at *3 (S.D. Ind. Mar. 17, 2020) ("a reduction under § 3582(c)(1)(A) is not warranted because the disparity between Mr. Neubert's actual sentence and the one he would receive if he committed his crimes today is not an 'extraordinary and compelling circumstance.' Instead, it is what the plain language of § 403 [of the First Step Act] requires."); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. May 9,

2019); *see also United States v. Lynn*, 2019 WL 3805349, at *3-4 (S.D. Ala. Aug.13, 2019);

*United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v.*

*Chan*, 2020 WL 1527895 (N.D. Cal. Mar. 31, 2020); *United States v. Willingham*, 2019 WL

6733028, at *2 (S.D. Ga. Dec. 10, 2019) (disagreeing with contrary decisions, stating,

"[t]hese cases, however, rest upon a faulty premise that the First Step Act somehow

rendered the Sentencing Commission's policy statement an inappropriate expression of

policy. This interpretation, and it appears to be an interpretation gleaned primarily

from the salutary purpose expressed in the title of Section 603(b) of the First Step Act,

contravenes express Congressional intent that the Sentencing Commission, not the

judiciary, determine what constitutes an appropriate use of the 'compassionate release'

provision"); *United States v. Schmitt*, 2020 WL 96904, at *3 (N.D. Iowa Jan. 8, 2020);

*United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019); *United*

*States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Ebbers*, 2020 WL

91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Overcash*, 2019 WL 1472104, at *2

(W.D.N.C. Apr. 3, 2019); *United States v. Hunter*, 2020 U.S. Dist. LEXIS 4305, at *5 (S.D.

Ohio Jan. 9, 2020); *United States v. Rodriguez*, 2020 WL 1627331, at *3 (E.D. Pa. Apr. 1,

2020); *United States v. York*, 2019 WL 3241166, at *4 (E.D. Tenn. July 18, 2019). *Cf. United*

*States v. Rivernider*, 2019 WL 3816671, at *3 (D. Conn. Aug. 14, 2019) ("In support of his

claim under subdivision (D), the defendant makes a variety of assertions: his

convictions and sentence are unlawful, he has served substantially more time in prison

than he expected to serve when he pleaded guilty, he has been mistreated and treated

unfairly, and his minor children are suffering in his absence. None of these factors is

comparable to the Commission's criteria for compassionate release.").

The first appellate decision on the issue agreed with this view. In *United States v.*

*Saldana*, 2020 WL 1486892, at *3-4 (10th Cir. Mar. 26, 2020) (not precedential), the panel

held that compassionate release is not available based on a change in sentencing law

that would produce a lower sentence today. The panel stated: "neither the § 1B1.13

commentary nor BOP Program Statement 5050.50 identify post-sentencing

developments in case law as an 'extraordinary and compelling reason' warranting a

sentence reduction." *Id.* at *3. Accordingly, the court held, a court lacks jurisdiction or

authority to reduce the defendant's sentence on this basis. *Id.*

Admittedly, some district courts have agreed with the defendant that a court

may now itself define the circumstances that permit a sentence reduction, unfettered by

the Commission's policy statement. Those other cases present scant reasoning, and

none addresses the extensive arguments presented here concerning the clear statutory

language. *See United States v. Rodriguez,* 2019 WL 6311388, at *7 (N.D. Cal. Nov. 25,

2019); *United States v. Brown,* 2019 WL 4942051, at *4 (S.D. Iowa Oct. 8, 2019); *United*

*States v. O'Bryan*, 2020 WL 869475 (D. Kan. Feb. 21, 2020); *United States v. Perez*, 2020 WL

1180719 (D. Kan. Mar. 11, 2020); *United States v. Bucci,* 2019 WL 5075964, at *1 (D. Mass.

Sept. 16, 2019); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019); *United*

*States v. Urkevich*, 2019 WL 6037391 (D. Neb. Nov. 14, 2019); *United States v. Beck*, 2019

WL 2716505, at *6 (M.D.N.C. June 28, 2019); *United States v. Young*, 2020 WL 1047815, at

*6 (M.D. Tenn. Mar. 4, 2020); *United States v. Cantu*, 2019 WL 2498923, at *5 (S.D. Tex.

June 17, 2019); *United States v. Maumau*, 2020 WL 806121 (D. Utah Feb. 18, 2020); *United States v. Redd*, 2020 WL 1248493 (E.D. Va. Mar. 16, 2020).

Here, the defendant has not identified any reasons for release of the type identified in § 1B1.13, application notes 1(A) through 1(C), or in the BOP program statement. The defendant has not identified (i) any terminal illness, or (ii) any "serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." USSG 1B1.13, comment. (n.1(A)). Thus, his motion must be denied.

The mere existence of the COVID-19 pandemic, which poses a general threat to every non-immune person in the country, is not a medical condition of the defendant and therefore could not alone provide a basis for a sentence reduction. The categories encompass specific serious medical conditions afflicting an individual inmate, not generalized threats to the entire population. As a court in this district previously stated, "[T]he mere presence of COVID-19 in a particular prison cannot justify compassionate release – if it could, every inmate in that prison could obtain release." *See, e.g., United States v. Melgarejo,* No. 12-cr-20050, Docket 41 (May 12, 2020). Similarly, the Third Circuit has held, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020), as revised (Apr. 8, 2020); *see also United States v. Eberhart,* 2020 WL

1450745, at *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A)."). *Cf. United States v. Young*, 2020 WL 2092837, at *5 (N.D. Ind. Apr. 30, 2020) ("The Court is sympathetic to the concerns of the Defendant; however, speculation about a future outbreak, especially when considered in tandem with the precautions taken by the Jerome Combs detention facility, is insufficient to constitute an exceptional reason . . .").

To classify the fear of contracting COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement. Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

Notably, the policy statement limits the types of reasons related to the medical condition of the defendant as conditions "from which he or he is not expected to recover." USSG § 1B1.13, comment. (n.1(A)(ii)). When a defendant has a serious condition from which he is not going to recover, it may make sense to reduce the defendant's sentence to time served, both out of compassion for the inmate and because as a result of the inmate's condition or deterioration the inmate no longer presents a risk

23

of danger to the community. Where the inmate is expected to recover, however, Section 3582(c)(1)(A) simply does not apply. In the context of COVID-19, the CDC's current statistics appear to show that well over 90% of individuals who contract it recover relatively quickly. In fact, anecdotally, the BOP website shows that 14 of the total 16 inmates at USP Atlanta who were identified with COVID-19 have already recovered, and none have died. Thus, a sentence reduction to time served would be a windfall for the vast majority of inmates, while placing the community at risk.

Fortunately, the defendant does not currently have COVID-19. Yet, he requests that his sentence be reduced by over eight years because of the current pandemic and his alleged asthma. These are not the type of reasons for a sentence reduction identified by the Sentencing Commission. Accordingly, the defendant's motion for a sentence reduction to time served is without basis under the statute.

## II. The Defendant Presents a Risk of Danger to the Community Under Section 3142(g), the Section 3553(a) Factors Do Not Warrant a Sentence Reduction, and BOP Is Addressing The Defendant's Concerns.

Even if this Court had the statutory authority to reduce the defendant's sentence, his request should be denied because his history and characteristics, including his prior drug convictions, large-scale drug trafficking, and Mexican drug cartel connections, establish that he is a danger to the safety of the community under § 3142(g). Under the applicable policy statement, this Court must deny a sentence reduction unless it determines the defendant "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). Additionally, this Court must consider the § 3553(a)

factors, as "applicable," as part of its analysis. *See* 18 U.S.C. § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

The defendant is currently serving a 194-month sentence for a large-scale drug trafficking conspiracy. This, coupled with the defendant's prior convictions for drug trafficking, shows that the defendant would pose a danger to public safety if released eight years early. This Court should deny a sentence reduction on that basis alone.

In addition, the § 3553(a) factors strongly disfavor a sentence reduction. The defendant's sentence is not the result of any mandatory minimum. It is the sentence the Court determined was sufficient, but not greater than necessary, to satisfy the Section 3553(a) factors. Thus, it would not reflect the seriousness of his offense, promote respect for the law, or provide just punishment for the defendant to receive an eight year (or 37%) sentence reduction simply because he may be at some risk of catching a virus that law-abiding members of the general public are also at risk of catching.

Moreover, the factors militating against a sentence reduction outweigh the defendant's asserted concerns related to COVID-19. As discussed, *supra,* the defendant has not identified any medical condition that falls within one of the categories specified in the policy statement's application note. He does not suffer from terminal cancer or a serious degenerative disease from which he is not expected to recover. Although he claims he has asthma, he does not even allege that it is moderate to severe, let alone present any medical records, documentation, or other evidence in support of his claim. The defendant's alleged asthma does not rise to the level of severity required under the policy statement.

25

Even if this Court concludes (contrary to the argument set forth, *supra*) that the defendant has established "extraordinary and compelling reasons" for a sentence reduction based on the risk of contracting COVID-19, the defendant has not established that he would be less vulnerable to serious illness from COVID-19 if he were released. He requests that he be released to Pharr, Texas. According to the CDC website, to date, Texas has 49,912 confirmed COVID-19 cases and 1,369 deaths. The entire inmate population at USP Atlanta has two current cases. Moreover, BOP is more than capable of providing the defendant with any medical care he needs. Thus, the defendant has not established he is more like to contract COVID-19 if he is not released, nor that he will receive better medical care if released from BOP custody.

Finally, BOP ultimately concluded that home confinement was not appropriate for this defendant, reflecting BOP's expert judgment that it is not in the public interest to release the defendant at this time in light of the defendant's individual circumstances. Accordingly, given the totality of the applicable Section 3553(a) factors, this Court should deny the motion for a sentence reduction.

## CONCLUSION

For the reasons stated above, the United States respectfully requests that this Court deny the defendant's motion for a dramatic sentence reduction to time served because (1) neither the fear of contracting a disease nor alleged asthma standing alone is an "extraordinary and compelling reason" warranting a reduction in sentence under Title 18, United States Code, Section 3582(c)(1)(A)(i) as defined by Section 1B1.13 of the United States Sentencing Guidelines; and (2) the defendant's release would present a danger to the community under Title 18, United States Code, Section 3142(g), the defendant's release is not warranted under the applicable Section 3553(a) sentencing factors, and the federal Bureau of Prisons has addressed and will continue to address the defendant's concerns.

Respectfully submitted,

JOHN C. MILHISER
UNITED STATES ATTORNEY

s/Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217/373-5891
eugene.miller@usdoj.gov

27

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2020, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system which will send notification of such

filing to counsel of record.

s/ Eugene L. Miller
Eugene L. Miller, Bar No. IL 6209521
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax:  217-373-5891
eugene.miller@usdoj.gov